# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| ANDY D. GLASS, | ) |
|          **Plaintiff,** | ) |
| | ) No. 3:14-01841 |
| v. | ) Judge Campbell/Brown |
| | ) |
| CAROLYN W. COLVIN, | ) |
| ACTING COMMISSIONER | ) |
| OF SOCIAL SECURITY, | ) |
| | ) |
|          **Defendant.** | ) |

**To: The Honorable Todd J. Campbell, United States District Judge.**

## REPORT AND RECOMMENDATION

This action was brought under 42 U.S.C. §§ 405(g) and 1383(c) for judicial review of the final decision of the Social Security Administration ("the SSA"), through its Commissioner ("the Commissioner"), denying plaintiff's applications for Disability Insurance Benefits (DIB) under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 416(i) and 423(d), and Supplemental Security Income (SSI) under Title XVI of the Act, 42 U.S.C. §§ 1381 *et seq*. For the reasons explained below, the undersigned **RECOMMENDS** that plaintiff's motion for judgment on the administrative record (Doc. 14) be **DENIED** and the Commissioner's decision **AFFIRMED**.

## I. PROCEDURAL HISTORY

Plaintiff filed for DIB and SSI on June 13, 2011 (Doc. 10, pp. 141-55), alleging a disability onset date of May 19, 2008 (Doc. 10, pp. 26, 156, 195).[1] Plaintiff subsequently amended his disability onset date to March 1, 2010. (Doc. 10, pp. 26, 28, 47-48, 69)

Plaintiff claimed he was unable to work because of a bulging disc. (Doc. 10, pp. 84-85, 90-

---

[1] References to page numbers in the Administrative Record (Doc. 10) are to the page numbers that appear in **bold** in the lower right corner of each page.

91, 189) Plaintiff's application for benefits was denied initially on August 1, 2011, and upon reconsideration on October 3, 2011. (Doc. 10, pp. 72-75, 80-91)

On October 24, 2011, plaintiff requested a hearing before an administrative law judge (ALJ). (Doc. 10, pp. 94-95) A hearing was held on April 25, 2013 before ALJ Elizabeth Neuhoff. (Doc. 10, pp. 41-71) Vocational expert (VE) Chelsea Brown testified at the hearing. (Doc. 10, pp. 26, 41, 65-69) Plaintiff was represented by counsel at the hearing. (Doc. 10, pp. 26, 42, 45)

The ALJ entered an unfavorable decision on May 3, 2013. (Doc. 10, pp. 23-40) Plaintiff filed a request with the Appeals Council on June 28, 2013 to review the ALJ's decision. (Doc. 10, 14-22) The Appeals Council denied plaintiff's request on July 10, 2014, whereupon the ALJ's decision became the final decision of the Commissioner. (Doc. 10, 1-6)

Plaintiff brought this action through counsel on September 12, 2014. (Doc. 1) Plaintiff filed a motion for judgment on the administrative record on January 1, 2015 (Doc. 14), the Commissioner responded on March 16, 2015 (Doc. 17), and plaintiff replied on March 24, 2015 (Doc. 18). This matter is now properly before the court.

## II. REVIEW OF THE RECORD[2]

### A. Medical Evidence

Plaintiff presented to Dr. Frank Berklacich, M.D., for lower back pain on March 6, 2008. (Doc. 10, pp. 316-17) Plaintiff's symptoms were "essentially . . . negative." (Doc. 10, p. 316) Doctor Berklacich noted that plaintiff was 5 ft. 9 in. tall, weighed 220 lbs., ambulated well without aids, was able to get up on his heels and toes without difficulty, could bend to mid tibia level, was neurologically intact without focal motor weakness, and that x-rays revealed "minimal spondylitic

---

[2] The excerpts of the medical record and hearing transcript addressed below are those necessary to support the court's analysis of plaintiff's claims of error. The remainder of the medical evidence of record and transcript of the hearing is incorporated herein by reference.

changes."³ (Doc. 10, p. 317)

Plaintiff underwent a MRI on March 13, 2008. (Doc. 10, pp. 280-81) The radiologist's impression was that plaintiff's spine exhibited minimal/mild irregularities, but was otherwise unremarkable. (Doc. 10, pp. 280-81)

Plaintiff was declared at maximum medical improvement by Dr. Berklacich on May 19, 2008. Doctor Berklacich limited him to lifting 50 lbs. maximum, and to lifting no more than 25 lbs. from floor to waist, 40 lbs. from waist to chest, and 25 lbs. overhead. (Doc. 10, p. 313) Plaintiff also was instructed to avoid bending and twisting. (Doc. 10, p. 313)

Plaintiff returned to see Dr. Berklacich for a follow-up on August 7, 2008. (Doc. 10, p. 348) Plaintiff advised Dr. Berklacich that he was "terminated from his job on January 29 . . . [and] . . . [h]e ha[d] applied at voc rehab." (Doc. 10, p. 348) Plaintiff was instructed to continue with the May 19 restrictions. (Doc. 10, p. 348)

On September 18, 2008, Dr. Berklacich noted that plaintiff was clinically stable, and neurologically intact. (Doc. 10, p. 305) Doctor Berklacich again noted that plaintiff anticipated enrolling in vocational rehabilitation. (Doc. 10, p. 305)

Doctor Berklacich noted on December 18, 2008 that plaintiff was working 7-8 hrs. a day, and that he was not "really having any radicular symptoms."⁴ (Doc. 10, p. 299) Doctor Berklacich also noted that plaintiff remained neurologically stable. (Doc. 10, p. 299)

Plaintiff advised Dr. Berklacich on May 11, 2009 that he "had a flare-up about six weeks" prior. (Doc. 10, p. 297) Plaintiff also reported that he had resumed working full time as a custom metal fabricator, and that he was tolerating the work "fairly well." (Doc. 10, p. 297)

---

³ Spondylolysis – "degenerative spinal changes due to osteoarthritis." *Dorland's Illustrated Medical Dictionary* 1754 (32 ed. 2012).

⁴ Radiculalgia – "pain due to disease of the spinal nerve roots." *Dorland's* at p. 1571.

3

In another follow-up, Dr. Berklacich noted on June 8, 2009 that plaintiff ambulated without aides, but moved cautiously, had diminished range of motion in his lumbar spine, but he was unable to appreciate any focal weakness in either leg upon static testing. (Doc. 10, p. 293) Doctor Berklacich also noted that he wanted plaintiff to undergo a MRI to "clarify the progression of stenosis."[5] (Doc. 10, p. 293)

Plaintiff underwent a MRI on July 10, 2009. (Doc. 10, pp. 279-81) The radiologist's impression was that plaintiff's spine exhibited mild irregularities, but otherwise was normal. (Doc. 10, p. 279) An annotation dated July 16, 2008 – attributed to Dr. Berklacich – penned to the report changed the radiologist's impression from "normal" to "moderate" at the L-2-L3, and from "mild" to "moderate" at the L3-L4. (Doc. 10, p. 279)

Doctor Berklacich examined plaintiff on July 23, 2009 and noted no focal weakness. (Doc. 10, p. 290) Doctor Berklacich also noted that he wanted to obtain a CT myelogram because his "review of [the] MRI of July 10, 2009, [wa]s different from the radiologist's interpretation." (Doc. 10, p. 290) Plaintiff underwent a CT lumbar spine myelogram on August 19, 2009. (Doc. 10, pp. 277-78) The radiologist's impression was that plaintiff's spine exhibited minimal/mild irregularities, but was otherwise unremarkable. (Doc. 10, pp. 277-78) Later, Dr. Berklacich noted on January 12, 2010 that the "CT myelogram, done in August, didn't really support the degree of stenosis seen on [the] MRI scan." (Doc. 10, p. 331)

Doctor Bruce A. Davis, M.D., examined plaintiff consultively on January 13, 2010. (Doc. 10, p. 318) Doctor Davis noted that plaintiff weighed 231 lbs., exhibited reduced finger dexterity, weak pinch/grip (3/5), lower back pain with spasm, a "weak left leg (3-4/5) without atrophy," and

---

[5] Stenosis – "narrowing of the vertebral canal, nerve root canals, or intervertebral foramina ["a natural opening or passage . . . into or through a bone"] of the lumbar spine caused by encroachment of bone upon the space . . . ." *Dorland's* at pp. 729, 1770.

"slow (pain) gait maneuvers across the exam room without assistance." (Doc. 10, p. 318) Doctor Davis also noted that plaintiff exhibited no acute distress, that his range of motion generally was normal, and that his straight leg raises were negative. (Doc. 10, p. 318)

On May 13, 2010, Dr. Berklacich noted that plaintiff was "clinically stable," "[wa]s not working," and "'piddles around the house.'" (Doc. 10, p. 329) He again noted that plaintiff remained "intact and stable" neurologically, and that he ambulated without aides. (Doc. 10, p. 329)

Doctor Berklacich noted on November 18, 2010 that plaintiff "continues to apply for positions, but has been unsuccessful so far." (Doc. 10, p. 327) He also noted that plaintiff had been walking 3 mi. per day, but "cut back" when his symptoms worsened. (Doc. 10, p. 327) Again, Dr. Berklacich noted that plaintiff was neurologically intact. (Doc. 10, p. 327)

On January 4, 2011, Dr. Berklacich noted that plaintiff was clinically stable, that he was not working because he was "unable to find a position," that he again was unable to "appreciate any focal weakness in either leg," and that his "gait pattern [wa]s normal." (Doc. 10, p. 325)

Doctor Berklacich referred plaintiff to Pain and Spine Consultants. A report by Dr. Victor Isaac, M.D., dated March 7, 2011 included the following:

> In general, the patient is overweight, well developed, well nourished, and . . . in no acute distress. . . .
>
> Inspection reveals no gross deformity or scoliosis. Gait is normal, without assistive devices. Range of motion is full. Palpation over the spinous process[6] is non-tender. Palpation over the lumbar facet line is tender on left. Palpation over the muscular tissues reveals tenderness in the lumbar paraspinals.[7] Mild tenderness in Left SI[8]

---

[6] Spinous – pertaining to the spine. *Dorland's* at p. 1750. Process – "a prominence or projection . . . of bone . . . ." *Dorland's* at p. 1517.

[7] Paraspinal – "near the spine . . . along the spine." *Dorland's* at 1381.

[8] SI – sacroiliac. www.spine-health.com/conditions/sacroiliac-joint.

5

joints, PSIS,[9] or sciatic notches. Straight leg raise with dural stretch signs in both seated and supine positioning is negative. Facet loading maneuvers involving standing extension and rotation are positive. Gaenslen's[10] and FABER's[11] tests are positive on left. . . .

Neurological exam reveals Cranial Nerves II-VII to be grossly intact. . . . Manual muscle testing reveals 5/5 strength in all major muscle groups. Sensation intact to pinprick in all major dermatomes.

(Doc. 10, pp. 355-56) The foregoing observations were repeated nearly verbatim by Dr. Isaac and two other physicians on April 4, May 2, June 2, 2011. (Doc. 10, pp. 362-70)

Plaintiff underwent a MRI on March 11, 2011 ordered by Pain and Spine Consultants. (Doc. 10, p. 371) The radiologist reported the following: 1) shallow central disc protrusion and annular tear at L3-L4 with mild congenital[12] central canal stenosis with slight acquired stenosis with mild to moderate foraminal stenosis; 2) slight disc bulge and congenital central canal stenosis with mild lateral recess and foraminal stenosis at L2-L3; 3) slight disc bulge and facet hypertrophy[13] at L4-L5 which causes mild to moderate foraminal stenosis without central canal stenosis; 4) disc space narrowing and spondylosis at L5-S1 without significant stenosis. (Doc. 10, p. 371) In short, the MRI revealed mild-to-moderate irregularities, but again the scan was otherwise unremarkable.

Doctor Berklacich treated plaintiff on August 9, 2011. (Doc. 10, p. 414) Doctor Berklacich noted that the repeat of the MRI "showed multilevel spondylitic changes [and] mild to moderate

---

[9] PSIS – posterior superior iliac spine. http://emedicine-medscape.com.

[10] Gaenslen's Test – a test "to detect musculoskeletal abnormalities and primary-chronic inflammation of the lumbar vertebrae and Sacroiliac Joint." www.physio-pedia.com/Ganslen_Test.

[11] FABER (flexion, abduction, and external rotation) – a test "to find pathologies at the hip, lumbar and sacroiliac region." www.physio-pedia.com/FABER_Test.

[12] Congenital – "referring to conditions that are present at birth, regardless of their causation." *Dorland's* at p. 403.

[13] Hypertrophy – "the enlargement or overgrowth of an organ or part due to an increase in size of its constituent cells." *Dorland's* at p. 898.

foraminal stenosis at L3-4 and L4-5." (Doc. 10, p. 414) Doctor Berklacich noted further that he was unable to appreciate any focal motor or sensory changes, and that plaintiff had "excellent strength of both legs against resistance." (Doc. 10, p. 414)

Doctor Christopher Fletcher, M.D., completed a physical residual functional capacity (RFC) assessment on July 31, 2011. (Doc. 10, pp. 375-83) Doctor Fletcher determined that plaintiff could perform medium work, *i.e.*, he: 1) could lift 50 lbs occasionally and 25 lbs. frequently; 2) could stand and/or walk for a total of about 6 hrs. in an 8-hr. workday; 3) could sit a total of about 6 hrs. in an 8-hr. workday; 4) had no pushing and/or pulling limitations. Doctor Nathaniel Briggs, M.D., affirmed Dr. Fletcher's opinion on September 15, 2011. (Doc. 10, p. 385)

Doctor Berklachich completed a treating source statement on October 29, 2012, opining that plaintiff: 1) could lift a maximum of 20 lbs. occasionally and 10 lbs. frequently; 2) could stand and walk about 2 hrs. in an 8-hr. workday; 3) could sit about 3 hrs. total in an 8-hr. workday; 4) could sit 30 mins. before having to change positions; 5) could stand 20 mins. before having to change positions; 6) must "walk around" every 30 mins.; 7) must walk at least 10 mins. each time he "walks around"; 8) must have the opportunity to shift at will; 9) needed to lie down at "unpredictable intervals" once or twice in an 8-hr. workday; 10) could never twist, stoop (bend) or crouch; 11) could climb stairs and ladders occasionally; 12) had no limitations reaching, handling, fingering, or feeling, but could not push and/or pull; 13) must avoid even moderate exposure to extreme cold and heat, concentrated exposure to high humidity, but no other environmental limitations; 14) could not crawl or kneel. Doctor Berklachich specified "Lumbar stenosis L3-04[,] L4-5 & Lumbar spondylosis" as those medical findings justifying these limitations. (Doc. 10, pp. 417-18)

### B. Transcript of the Hearing

Plaintiff testified upon questioning by the ALJ that he last worked in 2009 as an on-call

kitchen porter, but quit because "[t]he pain got so bad." (Doc. 10, pp. 49-50) Plaintiff testified that he weighed 220 lbs. at the time of the hearing, that his weight "varie[d] very little," and agreed with the ALJ that it was normal for his weight "to go up and down." (Doc. 10, p. 50) Plaintiff testified that he lived with his mother, and that he cooked, cleaned, and cared for her house. (Doc. 10, p. 51) He also testified that he could climb the 5 stairs in the house with the assistance of a handrail, that he had a current driver's license, and he was able to drive. (Doc. 10, p. 51) Plaintiff testified that he did not attend church often but, when he did, he experienced difficulty sitting after half an hour. (Doc. 10, p. 52) Plaintiff also testified that he no longer fished, camped, or did wood crafts because he was "financially not able to." (Doc. 10, p. 52) Plaintiff testified that he could sit "[p]robably 45 minutes" before he had to stand, stand 20 mins. before he had to sit, walk 10 to 15 mins. before having to take a break, could lift a gallon of milk, but would require assistance to lift a case of water. (Doc. 10, p. 57)

Plaintiff testified upon questioning by counsel that he had constant back pain. (Doc. 10, p. 62) According to plaintiff, the pain would "sometimes" radiate from his back down his left leg, and that he sat, elevated his legs, used foot therapy and a heating pad, and lay down in bed to relieve the pain. (Doc. 10, p. 63) Plaintiff testified that he had to lie down "[p]robably four hours" on a typical day. (Doc. 10, p. 63) According to plaintiff, he helped his mother by cooking and washing dishes. (Doc. 10, p. 63) Plaintiff testified that his typical day consisted of getting up in the morning, drinking some coffee, watching the news, sitting for awhile, walking around for awhile, then going back to bed to rest. (Doc. 10, p. 64) Although plaintiff testified that he could shop for two hrs., that included going to the store, returning home, and putting the groceries away. (Doc. 10, p. 64)

### C. The ALJ's Notice of Decision

Under the Act, a claimant is entitled to disability benefits if he can show his "inability to

engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1505, 416.905. Corresponding regulations outline the five-step sequential process to determine whether an individual is "disabled" within the meaning of the Act. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 374-75 (6th Cir. 2014). While the claimant bears the burden of proof at steps one through four, the burden shifts to the Commissioner at step five to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (RFC) and vocational profile. *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011).

The ALJ determined that plaintiff had the RFC to perform light work with the postural and environmental limitations shown below:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift and/or can carry 20 pounds on occasion and 10 pounds frequently; sit, stand, and walk six hours total each in an eight-hour workday; would be better with a sit/stand option; cannot do overhead work; can frequently perform all postural activities except for no repetitive bending or squatting; and cannot work around hazards such as unprotected heights or moving machinery.

(Doc. 10, p. 29)(bold omitted)  The ALJ determined that plaintiff had the RFC to work as a ticket seller, cashier, and/or furniture rental consultant. (Doc. 10, p. 34)

9

### III. ANALYSIS

#### A. Standard of Review

The district court's review of the Commissioner's final decision is limited to determining whether the Commissioner's decision is supported by substantial evidence in the record, and whether the decision was made pursuant to proper legal standards. 42 U.S.C. § 405(g); *Gayheart*, 710 F.3d at 374. Substantial evidence is less than a preponderance but more than a scintilla; it refers to relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see Gentry v. Comm's or Soc. Sec'y*, 741 F.3d 708, 722 (6th Cir. 2003). The Commissioner's decision must stand if substantial evidence supports the conclusion reached, even if the evidence also could support a different conclusion. *Gayheart*, 710 F.3d at 374. "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g); *see McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006).

#### B. Claims of Error

##### 1. Whether the ALJ Erred in the Weight Given to the Opinion of Dr. Berklacich
##### (Doc. 14-1, pp. 6-9)

Plaintiff makes the following arguments in support of his first claim of error: 1) "[t]he ALJ rejected to [*sic*] Dr. Chihombori's [*sic*] opinion and provided no good reason for doing so";[14] 2) the "ALJ appears to have given no weight to any medical opinions in the file" and, as such, "it is unclear how the RFC was formulated." (Doc. 14-1, pp. 8-9)

The record shows that Dr. Berklachich is a treating physician. Under the standard commonly

---

[14] There is nothing in the record to suggest "Dr. Chihombori" treated plaintiff. (Doc. 14-01, p. 8) Nor does Dr. Chihombori's name appear in the record before the court in any other context. The Magistrate Judge concludes that counsel actually meant Dr. Berklacich . . . not Dr. Chihombori.

called the "treating physician rule," the ALJ is required to give a treating source's opinion "controlling weight" if two conditions are met: 1) the opinion "'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'"; 2) the opinion "'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart*, 710 F.3d at 376 (quoting 20 C.F.R. § 404.1527(c)(2)). The Commissioner is required to provide "'good reasons'" for discounting the weight given to a treating-source opinion. *Gayheart*, 710 F.3d at 376 (citing 20 C.F.R. § 404.1527(c)(2)). "Th[o]se reasons must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Gayheart*, 710 F.3d at 376 (quoting SSR 96–2p, 1996 WL 374188 at *5 (SSA)).

The ALJ conducted an exhaustive 3-page analysis of Dr. Berklachich's medical treatment records. (Doc. 10, pp. 30-32) Thereafter, the ALJ wrote the following relevant to the weight given to Dr. Berklacich's treating source statement:

> The claimant's treatment records and the other medical evidence of record do not support [claimant's] allegations. While the claimant does have degenerative disc disease of the lumbar spine causing multilevel spondylosis, medical imaging suggests that the claimant has no more than mild to moderate stenosis at any level. Physical examinations repeatedly showed either normal range of motion or mostly retained range of motion in his spine. He typically retained normal gait. Straight leg raise testing was consistently negative and he never showed signs of serious neurological compromise, as his strength, sensation, and motor strength were all typically normal, despite his radicular pain. His treatment records show that epidural steroidal injections were very effective at treating his pain. The Worker's Compensation insurance refused to pay for such treatment, but the claimant's records from Dr. Berklacich show that his condition remained essentially stable without these injections. Further, records from Pain and Spine Consultants show that his pain can be reduced substantially with medication. He reported only fairly mild side effects from medication, suggesting that his functioning would not be significantly reduced by medication.

11

> The claimant's activities also dispute his allegations. The claimant's treatment records show that he sought work after he claims he became disabled, and suggest that the true reason he is not working currently is that he was unable to find work, rather than that he was unable to perform work. When the claimant originally applied for disability, he admitted that he mowed with a riding mower, cared for his mother, walked, shopped for two hours at a time, and spen[t] up to 20 hours a week fishing, walking, camping, and doing woodcrafts . . . . While the claimant alleged less activity during the hearing, he did admit he still cares for his mother and her separate house. Further, his treatment records suggest that his original statements were probably more accurate. For example, he told Dr. Berklacich he was walking up to three miles a day. Also, he indicated at the hearing that financial issues might partially explain why (if his reports are accurate) his fishing activity decreased. The undersigned also notes that the claimant sat during the entire hearing, which was just over 30 minutes in length. The undersigned also observed the claimant bend down to pick up something dropped by his attorney as they both were leaving the hearing room. The undersigned noted that the claimant swiftly bent down and then swiftly arose and he did not evince any type of discomfort or pain while doing such.
>
> . . . . [T]he undersigned notes the presence of a treating source opinion from Dr. Berklacich . . . . Dr. Berklacich suggests the claimant could perform significantly less than a full range of light exertional activity. His opinion is contradicted by the claimant's activities of daily living, examination findings, and pain improvement with treatment. It merits little weight.

(Doc. 10, pp. 32-33) As shown above, the ALJ gave a "good reason" for rejecting Dr. Berklachich's opinion, reasons that would be clear to any subsequent reviewer.

Having determined that the ALJ gave "good reason" for rejecting Dr. Berklachich's opinion, the next question is whether the ALJ's decision is supported by substantial evidence. Doctor Berklacich based his opinion on medical findings of "Lumbar stenosis L3-4 [and] L4-5 & lumbar spondylosis." (Doc. 10, p. 417) Thus, the question becomes whether the medical evidence of record supports the limitations/restrictions in Dr. Berklacich's treating source statement.

As previously established, x-rays ordered by Dr. Berklacich on March 8, 2008 revealed

"minimal spondylitic changes." A MRI performed less than a week later on March 13, 2008 showed minimal/mild irregularities, but was normal otherwise. Two months later, on May 19, 2008, Dr. Berklacich issued the restrictions above at p. 3 which are significantly less restrictive than those in the treating source statement at issue.

The record also shows that Dr. Berklacich ordered a second MRI which was performed on July 10, 2009. The second MRI revealed mild irregularities, but once again was unremarkable. Doctor Berklacich disagreed with the radiologist's interpretation of the second MRI, and ordered at CT myelogram to resolve the matter. The radiologist who read the August 19, 2009 CT myelogram reported only minimal/mild irregularities. Doctor Berklacich admitted later in a note dated January 12, 2010 that the "CT myelogram . . . didn't really support the degree of stenosis seen on [the] MRI scan." In other words, Dr. Berklacich's more restrictive reading of the second MRI was refuted by the CT myelogram.

As previously noted, plaintiff also underwent a third MRI. In addressing it, Dr. Berklacich wrote that it "showed multilevel spondylitic changes [and] mild to moderate foraminal stenosis at L3-4 and L4-5." A comparison of Dr. Berklacich's assessment to the radiologist's findings shows that Dr. Berklacich's assessment was simplistic, incomplete, skewed to the negative, and made no mention of the fact that the MRI was otherwise unremarkable – as were the previous two MRIs. There are no medical records after this date that would moot/call into question the findings of the third MRI, much less the earlier two MRIs and/or the CT myelogram.

In addition to the objective medical evidence discussed above, Dr. Berklacich noted repeatedly that plaintiff either was working, was looking for work, or planned to enter vocational rehabilitation. He also noted repeatedly that plaintiff was clinically stable, neurologically intact, exhibited no focal or sensory weakness, and was able to ambulate without aides, observations borne

13

out by the other medical evidence of record. Add to that plaintiff's testimony about his activities of daily living, in particular his admission at the hearing that he that he no longer fished, camped, and/or did wood crafts up to 20 hrs. a week because he was "financially not able to" – not because his back prevented him from engaging in those activities.

As shown above, the ALJ's decision to accord Dr. Berklacich's treating source statement "little weight" is supported by substantial evidence. Plaintiff's first argument is without merit.

Plaintiff argues next that "the ALJ appears to have given no weight to any medical opinions" and, as such, "it is unclear how the RFC was formulated." Although plaintiff does not say so specifically, it appears that he is referring to the ALJ's treatment of the state agency assessments with respect to which the ALJ wrote the following: "The State agency assessments also merit little weight, as their suggestion that the claimant could to medium exertional activity is overly optimistic . . . ." (Doc. 10, p 33)

Plaintiff's argument that the ALJ gave "no weight to any medical opinion" is factually incorrect. The ALJ gave <u>little weight</u> to both Dr. Berklacich and the state agency assessments. "Little weight" is not "no weight." Moreover, the ALJ is charged with evaluating the medical evidence, *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004), not parsing the weights given to the medical evidence so that evidence accorded "little weight" is offset by evidence of greater weight. In short, if the ALJ determines that the medical evidence is entitled to little or no weight, and her determination is supported by substantial evidence, then that's that!

Next, plaintiff has not alleged or shown that giving "little weight" to the state agency assessments worked to his disadvantage. In fact, the ALJ's treatment clearly inured to his benefit, *i.e.*, the state agency assessments at issue found that plaintiff was capable of performing medium work, whereas the ALJ determined that he was limited to light work.

Finally, at to plaintiff's argument that "it is unclear how the RFC was formulated," a plain reading of the decision provides the answer to that question:

> The undersigned considers the residual functional capacity above to operate within the treatment restrictions imposed by Dr. Berklacich in 2008. . . . Ultimately, the residual functional capacity is based on the claimant's objective medical findings, like the magnetic resonance imaging and CT myelogram results, along with his examination findings, tempered by his activities.

(Doc. 10, p. 33) It cannot be much clearer than that.

Neither of plaintiff's arguments in his first claim of error has any merit. Therefore, plaintiff's first claim of error is without merit.

## 2. Whether the ALJ Erred in Not Considering Plaintiff's Obesity (Doc. 14-1, p. 9)

Plaintiff argues that the ALJ erred in not taking his alleged obesity into consideration. Although plaintiff provides generalized legal argument and citation to relevant authority, he does not allege and/or show in either his memorandum or reply that obesity ever was at issue.

The district court is not obligated on judicial review to supply factual allegations in support of claims where no facts are alleged. *See Hollon ex rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 491 (6th Cir. 2006)("[W]e decline to formulate arguments on [appellant's] behalf"). Consequently, this argument is waived.[15] *See Moore v. Comm'r of Soc. Sec.*, 573 Fed.Appx. 540, 543 (6th Cir. 2014)(citing *United States v. Stewart*, 628 F.3d 246, 256 (6th Cir. 2010)("Issues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed

---

[15] Notwithstanding that this claim of error is waived, only occasional reference was made to plaintiff's weight in the medical record. However, plaintiff was never diagnosed as obese. Because plaintiff's alleged obesity was never at issue, the ALJ was not required to address it. *See Winslow v. Comm'r of soc. Sec.*, 566 Fed.Appx. 418, 421 (6th Cir. 2014)(citing *Rudd v. Comm'r of Soc. Sec.*, 531 Fed.Appx. 719, 729 (6th Cir. 2013); *Delgado v. Comm'r of Soc. Sec.*, 30 Fed.Appx. 542, 547-48 (6th Cir. 2002)(*per curiam*)(collecting cases)).

waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.").

### 3. Whether the ALJ Erred in Not Making a Function-by-Function Assessment in the RFC Assessment as Required by SSR 96-8p (Doc. 14-1, p. 10)

Plaintiff asserts a two-part argument in support of this claim of error: first, "the ALJ failed to perform the required 'function-by-function assessment[]' in the RFC finding" as required by SSR 96-8p; second, "the ALJ failed to include substantial limitations in the RFC finding correlating to symptoms and limitations which were well-documented in the record." (Doc. 14-1, p. 10)

Social Security Ruling 96-8p requires the ALJ to make a function-by-function assessment of his alleged limitations. However, "'[a]lthough a function-by-function analysis is desirable, SSR 96-8p does not require ALJs to produce such a detailed statement in writing,' as there is a difference 'between what an ALJ must consider and what an ALJ must discuss in a written opinion.'" *Beason v. Comm'r of Soc. Sec.*, 2014 WL 4063380 * 13 (E.D. Tenn. 2014)(citing *Delgado*, 30 Fed.Appx. at 547). More particularly, SSR 96-8p "does not state that the ALJ must discuss each function separately in the narrative of the ALJ's decision." *Beason*, 2014 WL at *13.

A plain reading of the ALJ's decision shows that she did not compare and contrast plaintiff's alleged limitations in her narrative. As established above, SSR 96-8p did not require her to. The ALJ did, however, make numerous references to having taken the entire record into consideration in reaching her decision, *i.e.*, "[a]fter careful consideration of the entire record" (Doc. 10, pp. 26, 28-29), "consideration of the entire case record" (Doc. 10, p. 29)," [a]fter careful consideration of all the evidence" (Doc. 10, p. 32). These statements, as well as the ALJ's detailed RFC analysis, demonstrate that she complied with SSR 96-8p within the meaning of *Delgado* and *Beason*.

Turning to the second part of the argument, plaintiff does not specify to which "substantial

limitations . . . in the record" he is referring. To the extent plaintiff may be referring to Dr. Berklacich's treating source statement, as previously shown, the ALJ gave good reasons for discounting those limitations, reasons that were explained in detail and supported by substantial evidence. To the extent plaintiff is referring to "substantial limitations" in those medical records not attributable to Dr. Berklacich, this argument is waived because plaintiff has failed to provide any argument or references to the record to guide the court in such an analysis.

Plaintiff's arguments in support of this claim of error are unavailing. Accordingly, this claim of error is without merit.

### IV. RECOMMENDATION

For the reasons explained above, the undersigned **RECOMMENDS** that plaintiff's motion for judgment on the administrative record (Doc. 14) be **DENIED** and the Commissioner's decision **AFFIRMED**. The parties have fourteen (14) days of being served with a copy of this R&R to serve and file written objections to the findings and recommendation proposed herein. A party shall respond to the objecting party's objections to this R&R within fourteen (14) days after being served with a copy thereof. Failure to file specific objections within fourteen (14) days of receipt of this R&R may constitute a waiver of further appeal. *Thomas v. Arn*, 474 U.S. 140, *reh'g denied*, 474 U.S. 111 (1986); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004).

**ENTERED** this 17th day of August, 2015.

/s/ Joe B. Brown
Joe B. Brown
United States Magistrate Judge